# IN THE COURT OF APPEALS OF IOWA

No. 19-0365
Filed November 27, 2019

IN RE THE MARRIAGE OF ANDREA LYNN RUBA
AND BARTEL IRVIN RUBA

Upon the Petition of
**ANDREA LYNN RUBA,**
        Petitioner-Appellee,

**And Concerning**
**BARTEL IRVIN RUBA,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Johnson County, Andrew B.

Chappell, Judge.


        A father of two appeals the physical care, child support, and property

division aspects of the decree dissolving his marriage to the children's mother.

**AFFIRMED.**


        Mark D. Fisher and Alexander S. Momany of Nidey Erdahl Fisher Pilkington

& Meier, PLC, Cedar Rapids, for appellant.

        David M. Cox of Bray & Klockau, P.L.C., Iowa City, for appellee.


        Considered by Tabor, P.J., and Mullins and May, JJ.

**TABOR, Presiding Judge.**

In dissolving the marriage of Bart and Andrea Ruba, the district court granted Andrea physical care of their son and daughter. The court then imputed income of $74,000 to Bart and $32,000 to Andrea, resulting in Bart's monthly child support payments of $865. When ordering Bart to make an equalization payment of $60,000, the court refused to exclude from the marital assets the value of the house Bart built himself before the marriage. Bart appeals on those three grounds.

Because the approximation of care before the divorce favors placing physical care with Andrea, we affirm the custody provisions of the decree. We also affirm the child-support order, because we find the district court's imputation of income to each parent was reasonable given the evidence presented. As for the property division, it was equitable for the district court to consider the North Liberty house to be part of the marital estate. That too is affirmed.

## I.    Facts and Prior Proceedings

Andrea and Bart married in July 2009. They had two children together: a daughter, R.M.R., in 2012, and a son, M.J.R., in 2014. Andrea has an older son from a prior relationship. Andrea and Bart had been married for about nine years when the court entered the divorce decree.

Bart was the primary breadwinner for the family. He had worked in construction since high school and started his own company in 2000. He built his own home on Forevergreen Road in North Liberty that same year. During the marriage, according to Andrea's recollection, Bart worked long hours with his crews from "sunup to sundown as much as they could." Bart contested that

characterization insisting the child-care duties were more equally divided between him and Andrea.

Before the marriage, Andrea owned a townhouse with her brother on Hayden Lane in North Liberty. In 2006, she moved into the house Bart built on Forevergreen Road. Bart eventually used equity from the Forevergreen Road house to purchase the townhouse from Andrea and her brother so that it could be used as rental property.

Andrea testified that during the marriage she was a stay-at-home mom: "I took care of the marital home, cooking, cleaning, laundry." But Andrea also had experience in massage therapy and started her own photography and graphic design business during the marriage.

Alcohol consumption caused difficulties for the couple. Bart had convictions for operating while intoxicated in 2001, 2005, and 2009. Both Andrea and Bart testified they often drank alcohol together in their basement bar after the children went to bed. Bart recalled them more often imbibing to a state of intoxication as their marriage faltered in 2018.

One night in early May 2018, Andrea and Bart dropped off their children with grandparents and headed to downtown Iowa City for a night of heavy drinking. Bart lost track of Andrea, who arrived home separately. She blacked out and failed to pay for her cab, which drew the police to their home. Later, Andrea and Bart physically fought in their kitchen. Andrea recalled Bart holding her against the cupboards with his arm across her face and neck. Bart denied that assault but admitted they exchanged mutual blows.

The State charged Bart with domestic violence strangulation; he eventually pleaded guilty to simple-misdemeanor harassment.[1]  Andrea was protected by a five-year criminal no-contact order against Bart.  Andrea and the children moved in with her parents after the fight.  As the district court noted, "that evening served as the catalyst for the parties' ultimate separation and this proceeding."

Andrea petitioned for dissolution in June 2016.  The district court held a three-day trial in September 2018.  In the December 2018 decree, the court granted the parties joint custody of their two children, awarded physical care to Andrea, and set liberal visitation for Bart.  The court then ordered Bart to pay $865 per month in child support.  The court denied Andrea's request for spousal support.  And after dividing the marital assets, the court ordered Bart to make an equalization payment of $60,000.  Bart now appeals.

## II.    Standard of Review

Because dissolution proceedings are equitable in nature, our review is de novo.  *See In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016).  We give weight to the district court's fact-findings, particularly when considering the credibility of witnesses, but they are not binding on us.  *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006).

---

[1] Bart entered an *Alford* plea, which is a variation of a guilty plea where the defendant does not admit committing the crime but acknowledges the prosecution has enough evidence to win a conviction.  *See North Carolina v. Alford,* 400 U.S. 25, 32-38 (1970).

### III.    Analysis

#### A.    Physical Care

Both parents sought physical care of the children, who were six and four years old at the time of the dissolution trial.  The parents agreed joint physical care was not a good idea given the level of animosity in their relationship.  *See In re Marriage of Hansen*, 733 N.W.2d 683, 698 (Iowa 2007) (explaining "a stormy marriage and divorce presents a significant risk factor that must be considered in determining whether joint physical care is in the best interest of the children").  The question on appeal is whether the district court should have awarded physical care to Bart rather than Andrea.

In deciding which parent can best address the children's needs on a day-to-day basis, courts must give considerable weight to "the factors of continuity, stability, and approximation."  *Id*. at 700.  We also look to the factors in Iowa Code section 598.41(3) (2018) and *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974).  Here, the district court properly weighed the factors.  The court found both Andrea and Bart would be suitable caregivers.  But the court decided "this case comes down to continuity and approximation."  In the court's opinion, "While Bart has been doing well with the children when they are in his care, he is notably playing catch up."  The court characterized Bart's role during the marriage as "primary breadwinner" and Andrea's role as "primary caregiver."

Bart takes issue with the court's characterization, claiming it was "not in keeping" with the trial testimony.  Bart contends, at best, the record suggests Andrea "performed a slight majority" of the child care during the marriage.  We disagree with Bart's view of the record.  Andrea testified she took the lead role in

child care, from their bedtime routine to scheduling doctor's appointments and attending parent-teacher conferences. Andrea's mother and brother also testified Andrea was the "primary caregiver" for the children during her marriage to Bart. The record justified the district court's decision on this point.

Bart also contends Andrea is the worse choice for physical-care parent because she has tried to undermine his relationship with the children. No question, "[t]he parent awarded physical care is required to support the other parent's relationship with the child[ren]." *Hansen*, 733 N.W.2d at 700 (citing Iowa Code § 598.41(5)(b)). In asserting a lack of support, Bart points to the district court's observation that Andrea used the no-contact order as a "sword" to limit his access to the children.[2] He also quotes the district court's opinion that Andrea had done an "underwhelming job" of fostering his connections to R.M.R. and M.J.R.

Bart's contention is not without some force. But we share in the district court's ultimate conclusion: "[A]fter some space has come with the dissolution decree, Andrea will be up to this challenge and better embrace Bart's relationship with the children. If she fails to do so, however, she could demonstrate herself unworthy of being the primary physical care parent." We concur in the district court's physical-care analysis.

---

[2] The district court declined to find a history of domestic violence in issuing the divorce decree. *See* Iowa Code § 598.41(3)(j). But in our de novo review we do recognize controlling behavior by Bart that may affect his ability to cooperate in parenting decisions. For instance, Bart twice placed tracking devices on Andrea's car so he could follow her movements with the children.

**B.    Child Support**

Having affirmed the physical-care assignment, we now turn to Bart's child support challenge.  For purposes of that calculation, the district court imputed earnings of $74,000 per year to Bart and $32,000 to Andrea.  Under the child support guidelines, those incomes resulted in Bart's obligation of $865 per month for two children, reduced to $606 per month when only one child is eligible for support.

Bart argues the district court estimated too high for his income and too low for Andrea's earnings.  Bart cites a "serious decrease" in the revenue for his construction company and contends his annual income should have been imputed at $48,306.  He asserts the district court neglected to add in Andrea's rental proceeds, which would push her annual income to $39,839.

We first consider Bart's income.  The district court found "Bart's financial records do not easily lend themselves to finding an accurate income number." Nevertheless, the court reached its $74,000 imputation by averaging the income amounts listed on Bart's financial affidavit for his 2016 Child Support Guidelines Worksheet ($92,308) and on his 2017 tax return ($40,576) "after adding back in the $15,569.00 business loss."  After adding those three figures, the court divided by two to obtain an approximate annual income of $74,000.

Bart argues the court erred by including the $15,569 amount in its income because he was entitled to carry over that loss.  It appears the district court viewed the 2016 loss used to offset 2017 income as immaterial with respect to which year it should be applied since the district court was averaging the total income for both years.  We agree with the district court's observation that the expenses, wages,

and losses on Bart's tax returns do not readily reveal an accurate income figure. And because Bart did not offer expert testimony about his business revenues and personal income, we cannot decipher a true reflection of his earnings. But after reviewing the district court's best attempt to make sense of those numbers, we affirm its reasoning.

The purpose of the Iowa child support guidelines "is to provide for the best interests of the children by recognizing the duty of both parents to provide adequate support for their children in proportion to their respective incomes." Iowa Ct. R. 9.3(1). It is permissible to consider earning capacity instead of actual earnings in applying these guidelines if using actual earnings would create a "substantial injustice" or adjustments are needed to "provide for the needs of the children and to do justice between the parties." *Id.* 9.11(4); *In re Marriage of Raue,* 552 N.W.2d 904, 906 (Iowa Ct. App.1996).

In our de novo review, we agree with the district court's implicit finding that using Bart's actual income as reflected on his 2017 tax returns would have created a substantial injustice between the parties. In addition, when a party's income fluctuates, the court may use an average income across a reasonable period to calculate a child support obligation. *See In re Marriage of Roberts*, 545 N.W.2d 340, 343 (Iowa Ct. App. 1996). We find no error in the district court's averaging of the years 2016 and 2017 to impute Bart's income. The imputed income of $74,000 for Bart was within the permissible range of evidence presented at trial. *See In re Marriage of Ohm*, No. 10-1079, 2011 WL 944879, at *6 (Iowa Ct. App. Mar. 21, 2011).

On Andrea's side, we find the district court properly declined to include rental proceeds from the Hayden Lane property awarded to her in the decree when calculating her income. The record reflected an uncertain income stream from that investment property. So it was reasonable not to include rent when imputing an annual income of $32,000 to Andrea. Thus, we deny Bart's request to remand for a recalculation of his child support.

### C. Equalization Payment

At trial, Bart asked the district court to award him the premarital value of both his construction company and the Forevergreen Road house that he built in 2000. The court declined to do so because Bart did not "provide any information as to precisely what these values were at the time of their marriage."

On appeal, Bart contends it was inequitable for the district court to include the house he built nearly ten years before the marriage in the divisible property. Bart asserts he "allowed" Andrea to move into the house in 2006, but that she did not "contribute financially to the residence." He argues that when the net value of the house, $149,376, is deducted from the marital assets, he would no longer owe Andrea an equalization payment.

Iowa law requires "equitable distribution" when dividing the property of divorcing spouses. *Sullins,* 715 N.W.2d at 247. Our courts equitably divide all property owned by the parties at the time of divorce with the exception of gifts and inherited property. *In re Marriage of Keener,* 728 N.W.2d 188, 193 (Iowa 2007). The particular circumstances of each case drives what is equitable. *In re Marriage of Rhinehart,* 704 N.W.2d 677, 683 (Iowa 2005); *see* Iowa Code § 598.21(5) (listing factors to be considered in property division).

A premarital asset is not set aside like gifted property. *See In re Marriage of Miller,* 552 N.W.2d 460, 465 (Iowa Ct. App.1996); *see also* Iowa Code § 598.21(5)(b). Instead, ownership predating the marriage is one factor to consider along with all other circumstances in determining the overall property division. *Miller,* 552 N.W.2d at 465. But "[p]remarital property does not merge with and become marital property simply by virtue of the marriage." *In re Marriage of Wendell,* 598 N.W.2d 197, 199 (Iowa Ct. App. 1998).

We are not persuaded the property division would be more equitable if the equity in the Forevergreen Road house—as of the time of trial—was set aside as Bart's premarital asset. Critically, Bart cannot trace that $149,376 in equity back to his outlay in 2000. *See In re Marriage of Elam*, No. 03-0221, 2004 WL 370247, at *4 (Iowa Ct. App. Feb. 27, 2004) (declining to set aside house payments to wife when ability to trace funds back to premarital status was "far from clear in the record"). The record shows Bart took out several loans on the Forevergreen property. But the record is unclear as to which portion of the equity accumulated on that property can be attributed solely to Bart's efforts. Also, Bart used equity from the Forevergreen Road house to help out Andrea financially by buying the Hayden Lane property for investment purposes. The house on Forevergreen Road served as the marital home where Bart and Andrea started to raise their children. Even if it was Bart's income that paid the mortgage there, both parties contributed to the upkeep of the house. *See In re Marriage of Lattig*, 318 N.W.2d 811, 815 (Iowa Ct. App. 1982) (recognizing as substantial the contribution of a homemaker spouse though other spouse contributed more financially).

Finally, we consider the decree as an integrated whole. *Id.* at 814. The district court rejected Andrea's request for spousal support, though believing she presented "a close case." The court noted the marriage was not of long duration. But neither could it be called short term. The court also determined Bart's interest in inherited farm property should not be considered a divisible marital asset. Under these circumstances, we find the $60,000 equalization payment to be equitable.

**AFFIRMED.**